Your Honor, good morning. Stephen Bruchetto for the Plaintiff, Keith Jacobs. What are you going to do to follow that ad? Well, in all honesty, I hope that I don't spill anything. Your Honor, the issue in this case on the breach of fair representation claim is whether you apply the Ninth Circuit's decision in Tenorio or whether this is a case which concerns a judgment of the union and therefore Tenorio isn't applicable. Well, why doesn't this case turn on the interpretation of the last chance agreement, wholly apart from any of the Tenorio factors, so that one could say, sure, maybe they're implicated, maybe they're not, but whether they are or whether they aren't, this case turns on what the last chance agreement means. It doesn't turn on the terms of the last chance agreement because what the union did here is it denied Plaintiff the right to go through the internal formal decision-making process. Well, based upon its interpretation of the effect of the last chance agreement. Regardless of any interpretation of the last chance agreement, Plaintiff still should be entitled to go through the internal decision-making process because, obviously, in this kind of circumstance, there is substantial room for presenting to the union membership that this last chance agreement did nothing to my appeal rights. But I think what Judge Reimer is getting at is, well, in view of the fact that, you know, their view of the union leadership's view of the agreement and their advice from their counsel, isn't that a position held in good faith? Maybe they should have done what you say. Maybe that was a better judgment. But how can you say what they did was arbitrary or in bad faith? The way I can say it's arbitrary. That's the question, isn't it? Whether it's arbitrary or in bad faith? Whether it's arbitrary in bad faith. That's the question. The reason I can say that that is arbitrary in bad faith, because even if you assume that that's the issue, there still is. That's not an explanation or justification for depriving Jacobs of the formal decision of the union. If that decision is the decision of the union, it should have been made by authorized people. I'm sorry. That lost me. All right. The union has a process for deciding grievances. And the process is under the bylaws. Are we talking about deciding grievances? Are we talking about deciding whether to grieve? I don't think we're talking about either of those. I think we're talking about deciding to take a piece of paper from a union member to start the internal process. I mean, Jacobs was shut out of the process. Okay. So now you're flipping to the rogue meeting. Is that what you're on now? To the rogue meeting. He knew he wanted to pursue his grievance. They did. After he said he wanted to pursue his grievance, they went and consulted their counsel to get a comfort feeling about the interpretation of the last chance agreement. And then there was a board meeting where nobody said go forward with a grievance. I don't think that those are undisputed facts. I think the undisputed facts are the day after he was terminated, he went to the president and said, I want to file a grievance, and the president said you've got no right to appeal. There is nothing in the next emergency board meeting indicating anything of consideration of Jacobs' appeal. The board doesn't have to decide to appeal or not to appeal, does it? Under the bylaws, there are two processes for decision making. One, the standing committee which, according to the bylaws, reviews all grievances and presents them to management. Or the e-board has general supervisory powers of the union between meetings subject to approval of the membership. If there was some issue that Jacobs could not file a grievance through the union, it needed to be approved by the membership. So the fact that a group of individuals, if they met on January 9th as opposed to February, made some kind of determination really isn't a decision of the union through an authorized process. And the harm to Jacobs is obvious. If you look at what happened, nobody from the company wanted to hear Jacobs' side of the story. Nobody from the union wanted to hear Jacobs' side of the story. He offers to get a polygraph and is told by his union rep on the morning he's terminated, we're not interested. He goes to file a grievance and the president said, I don't want to hear it. Well, which is why I say this whole thing turns on the last chance agreement. I mean, that's the whole reason why all of those things you just mentioned aren't material. Because the last chance agreement means just that. He's had his chance. He's out of here. He has, by virtue of the last chance agreement, no more rights under the collective bargaining agreement, no more grievance process, no more just cause required for termination. I mean, that's the bottom line. A judgment call, maybe if it had gone the other way, maybe not. But that's the judgment call made by the union. I don't see that that is where the case turns. Because even if there is a judgment call to be made, it should be made through the normal union process, giving Jacobs the opportunity. Well, for example, no one interviewed Jacobs about whether or not this provision in the last chance agreement waived any appeal rights. Nobody gave him the opportunity to bring in information for the formal union decision makers to consider whether or not this provision in the last chance agreement actually, you know, what the actual language was. And as we noted once we got into discovery, Leroy Thorpe, the president of the union, conceded in deposition that it doesn't waive appeal rights. The triggering event has to occur. And we also presented information that the union had filed appeals under the exact same language in a last chance agreement before Jacobs was ever terminated. When the union found out that he had signed the last chance, they realized there was nothing they could do. Well, if that were the case, then how would the union explain the fact that about four months before Jacobs was terminated, the union represented another employee on a last chance agreement with the same language. He had two last chance agreements, and the union filed an appeal. They went through their normal process. They presented it to management. They did their investigation. They let their standing committee make its decision. That's what Jacobs was denied. And there was a lot of room for arguing that the union, its attorney, everybody knew that this last chance agreement didn't waive a right to grieve. I mean, the language is plain on its face. So I would see the way the thing turns on, regardless of what the issue is, there really isn't any harm to the union or any reason for the union to not allow Jacobs to go through the decision-making process. He should have been able to appear in front of the e-board. He should have been able to present his position to the e-board and appeal to the membership, just like any other member of the union. If you don't accept that proposition, basically he's lost all his membership rights. I mean, basically what they're telling him is, you're no longer a member of the union. You don't have any rights to go to the membership. And I believe that... You know, I haven't pursued this intensively because it just seems to me like it's off point. But my understanding of your due process point is that it has to do with internal union membership disciplinary issues, which is a totally different deal from this, which is a relationship with the employer. Why is that not right? Well, I believe that it's not right because effectively the union and employer's position is that the union doesn't have to go through its normal decision-making process, which under the bylaws... But that's for internal union member conflict. That's not the deal here. The deal here has to do with whether to pursue a grievance against the company. There's two documents that... The decision, I thought, was reposed in the president or the vice president. No evidence whatsoever. Well, I take that back. There is a conflict in the evidence as to whether that decision belongs, whether the president is authorized to make that decision. We presented evidence that, in fact, the bylaws do not authorize the president to make that decision. There is nothing in the bylaws which say that the president can decide whether or not to process an appeal. I mean, and that's why we argue that they didn't go through the standard decision-making process. Those decisions should be made by the standing committee or by the board subject to approval of a membership. The due process argument is if the union does not take the grievance issue in front of the proper entities within the union and give Jacobs the ability to go to an e-board meeting, hear his case discussed, argue his case to the membership, he's effectively denied his membership rights. Why is he denied his membership rights? There's nothing in the last chance agreement denying him his normal membership rights. So our position is that effectively what the union has done is they've decided to side with the employer on this claim and they've decided to shut Jacobs out. And he's entitled to notice and an opportunity for hearing if that's the case. And I might add that the evidence is all susceptible to the argument that the union could have, with very little difficulty, permitted the processing of Jacobs' grievance, at least to the point to permit him to go in front of the standing committee or to appeal to the membership. So our argument is that if you look at the Tenorio decision, Tenorio focuses on four factors. And those are, is there an issue regarding the proper procedures that the union is using? In our view, the evidence presents issues as to whether the union went through the proper procedure. Two, is there a conflict of interest? Is there a potential conflict of interest? We believe there's a potential conflict of interest in the roles of Mr. Fortenberry, who was an executive board member, and in the roles of Mr. McDonough, who we believe was acting as much on behalf of the employer in union decisions as a union member. And three, did the union intend to handle the grievance in a perfunctory or summary manner? The union admits that it intended to handle the grievance in a summary manner. The final Tenorio issue is, does it concern the most significant issue, and that's termination. So in our view, it's squarely on point. This would be a different case if this decision had been, if somebody had talked to Jacobs, got his side of the story, somebody had gone to the standing committee, and the union had made a decision that there was no merit to the grievance. But that isn't the factual scenario here. I want to reserve about five minutes, so I'm going to take just about two minutes to talk about the disability discrimination claim. In our view, under the Lansford case, plaintiff has presented substantial evidence, both to establish a prima facie case that Mr. Jacobs was terminated because of a perceived disability, and substantial evidence that misconduct was not the motivating factor in the termination. This is a claim under state law, right? This is a claim under Oregon state law. Under Oregon law, he has to notify the employer in some way about his condition, right? Notify the employer of the condition. Of the disability or the, you know. I believe the employer has to have knowledge or notice of the underlying condition. And how is, and that, you know, some accommodation is necessary, medically necessary, right? I don't even think that this is an accommodation issue. What is it? I think it is an issue of different treatment on the basis of a perceived disability. And the perceived disability would be? An underlying mental disorder. Which would be? The mental disorder is, was characterized in depositions as mentally unstable. And there were reports to the employer to the effect that Jacobs suffered from emotional conditions, which included poor impulse control, difficulties in self-perceptions, difficulties in communicating with others, difficulties in. And that's a disability. I believe that coming from a psychiatrist. If you think your employer is having trouble getting along with his co-employees, that under Oregon law is a perceived disability. Coming from a medical professional? Yeah. Recommending the need for. I mean, if somebody is legitimately honestly having trouble getting along with people, I mean, he's a jerk or whatever, that's a perceived disability under Oregon law? I'm not saying that somebody who has a difficult time in getting along with others has a perceived disability under Oregon law. But what I am saying is that when the employer solicits a fitness for duty examination, gets a recommendation or a decision from a professional that the individual has emotional conditions that are described in the fashion that are in the report, and conditions the employee's continuation of employment upon treatment, I think that that is an underlying physical or mental impairment. I guess an employer who tries to help is doing himself a disservice. Is that the idea? The only issue of an employer trying to help doing a disservice is whether the employer operated on accurate information or... I'm just having trouble with the concept. That's the only reason I'm asking these questions. I don't understand exactly what you're saying the perceived disability is. I'm having a lot of trouble with that. The perceived disability is the employer's assumption that the employee is mentally unstable and as a result of mental instability is unable to get along with employees and is potentially violent in the workplace. So if the employer has that perception, what is the employer's obligation under Oregon law? The employer's obligation is to not discriminate on the basis of it. In the context of this situation, the discrimination is different treatment. And our argument was very simply that the employer could have and should have sat down and talked with Jacobs, informed him of what the charges are, got his side of the story, given him an opportunity to present any evidence. Didn't they do that with the last chance agreement? They had done that in the past with the last chance agreement. What do you mean? But they did not do it in relationship to the incidents that led to it. What are you saying? They have to just keep doing it over and over and over again every time an incident comes up? That's all they ever do? Well, with respect to a new incident, yes, since they've never heard what he had to say about that. There's nothing unfair or inappropriate about that. And as a matter of fact, our position is that precisely what the employer did in this kind of circumstance is because they knew of this psychological evaluation requirement for treatment, they assumed that he was guilty of what was claimed, without giving him an opportunity to explain his side of the story. I'm down to two minutes and 50 seconds, so I'm going to save that for rebuttal. Thank you, Your Honor. All right, who's going first? All right. Good morning. May it please the Court. My name is Thomas Doyle from the firm of Vannett Hartman here in Portland, representing AWPPW Local 13. I think Your Honor stated correctly when you said this case comes down to the last chance agreement. This employee was on two last chance agreements. The last chance agreement specifically stated the employee waived their right to any defenses. The employee had an incident whereby it was clear to the local leadership that the employee had violated company policy, and it was clear to the local leadership that based upon their reading of the last chance agreement, that in fact the employee had no right to appeal that termination. There was a meeting that was held provisionally, whereby the executives of the local said, this is our understanding. This is probably where this is going to end up. We're not filing an appeal. In fact, it's undisputed that the day after the employee was terminated, he was told, you have no right to appeal. Who has the authority under the bylaws to make that decision? The vice president is known as the grievance chair, and where you have an individual that is seeking to file a grievance, it's the grievance chair who has the authority to file any grievances. Not the grievance committee? Not the grievance committee. The grievance chair can make the decision on whether to file a grievance or not. Someone comes out of the blue and says, I want to file a grievance about the president of the United States. They say, no, that doesn't come under our grievance language. Sorry. Did the union try to do anything on his behalf? Absolutely. Well, the union had tried for years to do things on his behalf. In fact, they had negotiated the last chance agreement first. Then when there was a violation of that first last chance agreement, or arguably, they convinced the employer that, look, the last chance agreement really didn't cover this area. So then the employer said, okay, we'll give you another last chance agreement, and we're broadening it to include every violation. So that was an attendance issue. They said, you have to follow all the policies. He goes ahead. We have three different incidents where he's alleged to have violated that second last chance agreement. What do they do? They do an investigation. They speak with the individuals who have the complaint about the Heister incident, attempted running over to co-employees. They talk to another employee who was feeling harassed, Rick Souter, who was feeling harassed by the employee. They talk to a third employee. They do that as part of the investigation, to figure out whether there's what's out there, what's going on. Then they assign someone to represent the employee, Mr. Jacobs, in the meeting with management. And, in fact, it's undisputed that that grievance representative, that union representative, Mr. Spores, meets with Mr. Jacobs for an hour and a half before the investigation meeting and before the meeting and says, this is the situation. They've told me that this is what they've got. They're going to fire you. You have a choice. Either you're going to go out peacefully or they're going to fire you. You either resign or they're going to fire you. That's an hour and a half long discussion. It took a long time to go over those issues. Repeatedly, Mr. Jacobs said, didn't happen, didn't happen, didn't happen. That's what the union did to help him. In fact, the union went above and beyond and confirmed their understanding of the effect of the last chance agreement on the employee's rights. They talked to their counsel, and the counsel said, yeah, that's what that means. That's the way it's probably going to be interpreted. You're waiving your defenses. You're waiving your right to appeal. So, as a result, the union made the decision not to proceed with that grievance, not to file that grievance, because there was no right to appeal. That's an act of judgment. In fact, they didn't have to do any investigation under the reading of Evangelista. Under Evangelista, where it turns on a contract interpretation issue where it's clear on the face of the contract, and they render basically what would be considered a legal decision that, look, we don't have a right to appeal that, the union doesn't have to conduct any further investigation than that. But they went above and beyond the call of duty. They did investigation, and they spoke with their counsel to confirm that, what would be referred to as a legal opinion. There's no evidence of bad faith. There's no evidence of discriminatory treatment by this union. And, in fact, there certainly is no evidence of disability discrimination by this local. I haven't heard any evidence presented on that. I noticed my time has just started at 1953, so I think I've taken a little more than seven seconds. Unless the court has any additional questions, I'll reserve the remainder of what I actually have and let the employer's representative speak on this issue. Thank you. It's ten minutes. You would have ten minutes. May it please the court, Brad Tellem, on behalf of Georgia Pacific. So I'm down to what? You've got about ten minutes. Ten minutes? Perfect. I won't take that long. Let me, initially I want to echo some of the things that Mr. Doyle just said. He correctly noted that the Evangelista case suggests a number of things, including the fact that the scope of the union's investigation is limited, is going to be determined by the circumstances and the context. And the context here, which is what I don't think we can forget, is that there were last-chance agreements, and those last-chance agreements, whether or not there were the determination that could ultimately be made one could disagree with on whether or not agreements should go forward, those last-chance agreements in effect limit or suggest what the scope of the investigation should be. And, Judge Reimer, I think you were exactly correct at the beginning of the argument when you suggested that this case begins and ends with a last-chance agreement. The union did an investigation, obtained legal advice relating to it, and that is the duty of fair representation claim. That's obviously not my job. The DFR claim is against the union. So what I wanted to do was to just spend a couple of minutes talking about the last-chance agreement itself, clarify a few points perhaps, and then just talk briefly about the disability discrimination claim. The last-chance agreement, there's a couple of things that I just want to clarify in the reply brief. There's a discussion of a fields arbitration and some suggestion that because the last-chance agreement either wasn't authorized by the collective bargaining agreement or that because nobody from the union signed on, that therefore the last-chance agreements weren't valid in some abrogation  In fact, the fields arbitration language, which is in the excerpt of record, although there's a few missing pages, but at least from what I've been able to figure out from it, that decision related to, again, coincidentally enough, two last-chance agreements that were signed. The first one was without a union representative present. The second one did have a union representative present. And while the arbitrator in the fields arbitration said that because there was no union representative present while the union member negotiated the last-chance agreement, in fact, in this particular case, there was union representation at both of the last-chance agreement signings. And so I don't think there's any merit to that argument at all. There's also some discussion about whether or not there was duress in the execution of either of the two last-chance agreements and some suggestion that there may have been something more than what one would normally think about in a last-chance agreement. But I would direct the court to supplemental excerpt of record at page 19 in which the duress was, if you don't sign the last-chance agreements, you will be fired. I think that's the duress that's inherent in every last-chance agreement, and so there's really nothing. Yeah, if that's duress, there was duress, but I think that's appropriate duress under the circumstances. There's also some suggestion that the last-chance agreement is, I think, ambiguous would be the best way to describe it and that there's nothing that says that Mr. Jacobs' conduct relative to the Heister incident or to the Rick Suter Bible or the incident with Mr. Herbert that somehow he couldn't have known what he wasn't supposed to do. But, you know, Mr. Jacobs was very clear in his deposition that there were some things that he was supposed to do and he understood them. He talked about that he had to act like a robot, that he needed to watch his back and not talk out of turn to anybody and do his job. All of those things, those three incidents alone or collectively suggest, in fact, that there was a violation of the last-chance agreement, that he knew what the last-chance agreement imposed upon him and that the company was absolutely justified in terminating him. With respect to the disability claim, let me make a couple of points. First of all, and I don't believe I heard counsel dispute this, I think we are clearly under the federal McDonnell Douglas analysis in determining the allocation of the burdens of proof at the summary judgment stage, even though it's a state claim. The Snead case from several years ago suggests that that's the case in diversity cases and I don't know of a principled reason why that wouldn't be the case here and I think that that is accurate. There are differences and the Oregon Court of Appeals has recently suggested again that there is a distinction between federal law and state law, Oregon state law disability scheme, relative to what the definition of disability is, and that there may be some broader scope of disability that is picked up. That, however, doesn't mean that we have some difference here. In the first place, as Judge DeSema, you are absolutely correct, this is a regarded-as claim so the accommodation analysis does not even apply and we are looking at a regarded-as condition. The cases where the Oregon courts have found the distinction of disability is the Sutton kind of analysis. Do we look at disability in the context of mitigating circumstances or not? The Oregon courts to date have said we don't look at the mitigating acts that have taken place, we look simply at the disability of the individual. This is a regarded-as claim and we don't have mitigation, we don't have anything like that. What we have, and Judge Reimer, I think you hit it exactly on the head, we have someone who is unable to interact with others wanting that to be a regarded-as disability claim and there are plenty of cases that suggest that that is absolutely insufficient and there is no Oregon authority on point. Even though if we got that far, the simple fact is that there is no evidence of pretext here and obviously we have to have some because the articulated response from the employer is this is a case where the last chance agreements were violated, that's why we did the termination. It has nothing to do with anything that we thought about Mr. Jacobs regarding his... But the violation was the result of this disability. That's the plaintiff's side, right? That is the plaintiff's side, but I don't believe that there's any proof, any facts in the record to suggest that that's causation. That is an inference that clearly the plaintiff wants to take, but there's no evidence in the record other than the fact that they thought he had a difficult time getting along with others or was violent. I suppose that he would respond that the... Was it Patterson or Peterson at the exit interview basically? Peterson. Saying that he should go see a doctor again because it seemed to help for a while. Might show. Certainly, but again, I think that goes back to your point that if an employer shows empathy for an employee, maybe is that some basis, and frankly by that time the decision had been made to terminate. It may be. Why isn't it? I just wouldn't, I don't believe it is. I don't see how the suggestion that someone, if someone had broken a leg and you said continue on, go to the doctor, you're not regarding someone as necessarily disabled. And the fact is that the incidents were things that to be regarded as having a disability, the employer has to be mistaken about what the disability and what the material limitations are. In this case, if the employer was concerned about Mr. Jacobs' inability to get along with others, that's okay because that's not, there are cases that suggest that that is not in fact a regarded as disability claim. The kind of empathy that an employer suggests to an employee in this circumstance simply doesn't rise to the level to establish causation or pretext. How long did he work for the company? I believe 10 or 11 years. Pardon me? 10 or 11 years. Mr. Brichetto probably knows that one. How long was he? That I don't know. Thank you. Mr. Brichetto? He worked for the company 11 years, Your Honor. Pardon me? He worked for the company 11 years. Okay. Age, mid-30s. Okay. And he knows how to read and write? He knows how to read and write. Okay. Just very briefly, the, I do want to take a moment just to respond to issues about who was authorized to do something in this kind of circumstance. The Local 13's bylaws are set forth in the record at ER 76, and the bylaws describe the duties of the officers, including the president and the vice president. The bylaws contain no authority, they contain no statement indicating that either of those people in either of those offices has authority to decide whether to process grievances. Rather, on page 80, the bylaws talk about ER 80. The bylaws talk about the executive board's authority. And on 81, excuse me, 82, they talk about the standing committee's authority. And the standing committee has authority to, the standing committee shall review and present grievances to management. The bylaws require the standing committee to review any grievance of any member. Now, let's assume that the court concludes that somebody else made the decision besides the standing committee. The problem with that argument is that there are disputed issues of fact. The union claims that the president or the vice president made the decision. However, the president signed interrogatories saying that it was the executive board who made the decision. The union takes the position that this occurred at an informal meeting of union officials where the decision was made. However, the interrogatories say it was the executive board. And there is no recorded decision of the executive board. So the union can't establish as undisputed fact the facts upon which they rely to say a judgment was made. When he appeared before these officers of the corporation, did someone from the union go with him? When he appeared before, someone from the union did go with him. It was a shop steward, Mr. Spors. Went with him on that occasion? Went with him on that occasion. Yes, sir. He was there when he signed it. When he signed the last chance agreement? Yes, sir. The two last chances agreement, one he was accompanied by Mr. Tharp and one he was accompanied by Mr. Spors. I note that my time is up. I appreciate your consideration, judges. Thank you much. Thank you, counsel. All of you, the matter just argued will be submitted and the court will stand in recess for the day. All right. Thank you.
judges: Rymer, Tashima, Weiner